'Opinion of the court, by
Judge Burnet :
There is some contradiction in the testimony, and some inconsistency in the statements of a part of the witnesses, but the leading facts on which the case must depend are sufficiently ascertained. The bill, answers, and exhibits show that in 1811 Newman sold to the defendant, Beam, five quarter sections of land, containing eight hundred acres, at four dollars and fifty cent's per acre, amounting to four thousand four hundred dollars. For two of these quarter sections Newman had obtained a patent. The remaining three •had not been paid for, in full, to the government, and consequently *358 were held by certificates of purchase. Beam, was to complete the payments, and, to enable him to do so, the certificates were assigned-The legal title of the two quarters remained in Newman, who gave a title bond in the penal sum of seven hundred and fifty dollars, with a condition to convey them on the payment of that sum. One thousand two hundred dollars of the purchase money was paid in hand — notes, or sealed bills, with the defendant Hedges as security, were given for the residue, payable by installments. Newman, the vendor, died in 1813, having devised the notes to his widow, one of the defendants in this suit. Payments were made by Beam to Newman in his life, and to his widow since his death, by which the debt has been reduced to one thousand one hundred and *sixty-seven dollars and seventy-six cents. After the death of Newman his executors obtained a general order of court to execute deeds. The order is admitted by both parties to have been illegal and void. The executors, however, executed a deed to Beam for the two quarter sections in question, on the supposed validity of that order. The complainant obtained a judgment against Beam in August, 1817, in Belmont county, on which there is a balance of one thousand two hundred dollars due. Execution on this judgment was sent to Bichland county and levied on the two quarter sections not conveyed, there being, as it is alleged, no other property on which the money can be made. The object of the bill is to subject the two quarter sections to sale for the satisfaction of the complainant’s judgment. The principal matter in dispute is whether the court will require, the defendants, or those holding the legal title, to part with it for the benefit of the complainant before the residue of the purchase money is paid.
The principal points discussed by the counsel are the following:
1. Had the vendor a lien on the land'for the purchase money?
2. If he had such a lien, has it been lost or relinquished by the subsequent conduct of the parties ?
3. Bid the payment of the sum of seven hundred and fifty dollars, named in the bond, entitle the purchaser to a deed for the two quarter sections before the whole of the purchase money due on the contract was paid ?
4. Will the court give effect to the deed made to Beam by the executors of Newman, agreeably to the prayer of the bill ?
On the first point, the authorities clearly show that a vendor has- *359 a lien on the premises sold for the purchase money, and that his lien is not affected by conveying the premises and taking a note or bond, with personal security, for the money. It exists in every case of a sale where the money is not paid, unless it be otherwise agreed to by the parties, either expressly or by such arrangements as clearly show their intention, and it is incumbent on the party contesting the lien to show that it has been relinquished. *9 Ves. 209; Turner v. Bayne, 1 Johns. Ch. 308; 2 Ves. 622; 3 Eq. Cas. Ab. 682; [n] 1 Vern. 267; 3 Atk. 272; 6 Ves. 752; 3 Bibb, 183; 2 Wash. 142; 1 Brow. Ch. 301. In Pennsylvania and in South Carolina the right of the vendor to his equitable lien seems not to have been recognized, but it has been admitted and enforced in most of the state courts, and in this court, as oiten as the question has been presented. Jackson v. Hallock, 1 Ohio, 318. As between vendor and vendee the rule is not questioned by the counsel on either side. But on the part of the complainant it is strenuously contended that it does not exist in favor of these defendants, and a variety of circumstances have been referred to for the purpose of taking the case out of the rule. As, for example, the vendor took obligations with personal security for the purchase money, and that those obligations were payable by yearly installments. The first part of this objection has been disposed of already, and it is not easy to discover why the fact that the money was payable by installments should change the rights of the parties. That circumstance can not affect the contract, or the consequences resulting from it. As to everything connected with this question, it is immaterial whether the money be payable in a gross sum, or by installments, on different days. It was also urged that because the legal title was retained by the vendor for for a time and afterward conveyed, with the assent of the devisee, we must draw the conclusion that the parties did not intend to have a lien reserved. To rebut the inference drawn from this circumstance, it is only necessary to state that the retaining of the title by Newman till the time of his death evidences a determination on his part to hold the land as his security; and that as the executors were not privy to the contract, and were ignorant of the intention and understanding of the parties at the time it was made, their attempt to convey the land after the death of Newman can not have any bearing on the question; we can not draw from it an inference inconsistent with the manifest design of the *360 vendor. But this question does not rest on this inference alone. The testimony of Pearce proves that it was a part of the contract that Newman ^should hold the land as security for the money. Such proof, however, was not necessary on the part of the defendants. The existence of the lien must be presumed until the contrary appears. It rests with the complainant to show that ■the vendor did not rely on it.
The second inquiry is, has the lien been lost by anything that has taken place since the contract was made. The complainant contends that if the lien did exist in the life of Newman it ceased at his death, and that the devisee can not claim it, because by the devise the debt has been separated from the land.
The case of Jackman v. Hallock, 1 Ohio, 318, has been cited to sustain this position. That was a claim set up by the assignee of a note in the life of the vendor. It was a transaction between the living. A majority of the court were of opinion that the lien did not pass by the assignment. But the circumstances of the two cases are materially different, and the decision in that case does not necessarily conclude this. The force of the argument nsed on that occasion seems to be that the vendor may separate the equitable lien from the legal right, that he may assign the latter, but can not pass the former, because it is given for his own exclusive benefit. Adopting this reasoning as conclusive, it admits that while he retains the legal right, the equity will attach to it, and, upon that principle, if he retain them united till his death, they must both descend to his heir, or pass to his devisee, because the act of God shall not injure'any man. The death of a vendor can not impair his rights. They must pass to his representatives in the condition in which they were at his death. If the debt, in the hands of Newman, during his life, was an equitable lien on the land, it must continue so in the hands of the heir or devisee, for at his death all his legal and equitable rights pass, by operation of law, in the same state in which he held them. No good reason can be assigned why any of them should be forfeited by an act of Providence not under his control. The duration of an estate may be limited by the term of the grant to the life of the grantee. But such a limitation was not contemplated by the parties in this case. The rights mutually acquired were intended to survive.. *There was nothing in the nature or terms of the agreement inconsistent with such an incident, and I do not see *361 by what rule of construction a limitation can be applied to the •equitable that does not equally affect the legal right. The security for the debt should be as permanent as the debt itself. They ought to exist and expire together. The object cf the one was to insure the enjoyment of the other, and if either is to be forfeited by the death of a party, I am at a loss to determine which it should be. The lien of a vendor is not founded on arbitrary principles that require a rigid construction. It is not of such a nature as should induce a court to lay violent hands on it whenever a plausible pretext can be found for doing so. It is founded on principles of justice, and ought, therefore, to be protected. It originated in the care which the law has for the preservation of equitable rights. It was intended to prevent one man from enjoying the property of another without consideration, and it therefore applies as well to the representative of a deceased vendor as to the vendor himself. It is in the nature of a mortgage, provided by the benignity of the law for those who may have been too confiding ; and, in my estimation, our legal system, would be imperfect without it. The great object of every code of laws is to prevent injustice, and the more effectually that end is accomplished the nearer does it approach to perfection. Justice certainly requires that real property, sold on contract, should be answerable for its price as far as is consistent with the safety of third persons. Hence legal mortgages have been resorted to, and the doctrine of equitable liens has been established; and as these securities are similar in their operation, and have originated from the same policy, they ought to be equally favored. In Martin v. Mowlen, and Green v. Hart, 2 Burr. 979; 1 Johns. 590, mortgages are treated as chattel interests, which may be discharged by parol, not being within the statute of frauds.
This would show that there is no essential difference between legal and equitable mortgages as to the solemnity required in their discharge. They both originate in contract, the one by express stipulation, the other by operation of law.
*From this view of the subject it seems to be a just conelusion that the death of Newman did not extinguish his lien on the land in question, and that the right survived for the benefit of those to whom it legally belongs.
As the death of Newman, and the attempt to convey by his executors, are the only circumstances which have taken place since *362 the contract was made, calculated, in the opinion of counsel, to destroy the lien, and as neither of these is sufficient for that purpose, the conclusion follows that if the lien ever existed it continues to-exist.
But before this point is dismissed I will notice some of the authorities cited by counsel as having a bearing on it.
Much importance is attached to Pollexfen v. Moore, 3 Atk. 272. The defendants rely on it to establish the lien, and the complainant quotes it to show that the lien expired at the death of the vendor. It has often been remarked that the report oí that case was very obscure, and the master of the rolls in Trimmer v. Bayne, 9 Ves. 210, affirms that Lord Hardwicke destroys his own dictum, that “ the equity will not extend to a third person,” by the decree which he makes in the same case. The object of the cross bill was to protect a legacy given out of the personal estate, either by requiring the complainant in the principal bill, who was a vendor, socking for his purchase money, to resort to his equitable lien or otherwise, if he were allowed to exhaust the personal estate to the prejudice of the legatee, that she might succeed to his equitable right; and in the face of his own dictum the chancellor marshaled the assets, so as to give her all the relief she was entitled to. He established the equitable lien, and confined the vendor to that fund, by which the personal estate was so far preserved for the legatees. In other words, he decided that the land, after it had descended to the heir of the purchaser, should be bound for the purchase money, for the benefit of a person not a party to the contract; and not only so, but that the vendor should resort to that lien, and exhaust the fund in the first instance. The object of the cross bill was thérefore gained, and the equitable lien enforced for the benefit and at the instance of a third person.
*So far as the principle really settled in that case has a bearing on the dictum of the chancellor, it appears to condemn it, and to favor the conclusion that it has been introduced by the carelessness or misapprehension of the reporter. It appears, however, to be the foundation of the doctrine now contended for, and to have led to all the controversy on the subject, which is found in the subsequent cases. But the object I had principally in view in turning to that case, was to distinguish it from the case before us, by showing that these defendants can not be treated as third persons in the sense in which the chancellor used the phrase. Mrs. *363 Moore, whom Lord Hardwicke denominated a third person, waa not concerned in the sale, or purchase of the land; she had no interest, either original or derivative, in the purchase money. Her claim had no connection with the debt created by the .purchaser, or with the lien which the law created for its security. She was, in the literal sense of the words, as to that transaction, a third-person, a stranger, seeking to protect a legacy, that had no relation to the sale of the land, and in which the vendor never had an interest. Her prayer was, if the vendor did not avail himself of the lien, that the court would place her in his shoes, and transfer to her his equitable right. A simple statement of the case shows-that it is not analogous. Mrs. Newman, in this sense, is not a-third person, she can not be called a stranger to the transaction, she has succeeded to the rights of her husband, resulting from that-contract — she stands in the shoes of the vendor, and as the legal owner of the debt, claims the benefit of the security attached to it. She is the only party in interest. The lien cannot operate in favor of any other person ; she does not attempt to meddle with the rights of others, and can not therefore be denominated a third person.
The case ought not to be carried further than its terms necessarily require. Subsequent cases should not be brought within its influence by remote analogy. Mortgages are considered as inseparable from the debts to which they relate. They follow them as the shadow follows the substance, so that any act amounting to a legal transfer of the debt will carry with it the mortgage. In Martin v. Mowlen, *2 Burr. 973, Lord Mansfield states it as a settled rule that a mortgage, being a charge on the land, whatever will give the money will convey the estate in the land along with it, to every purpose. If the debt be assigned, devised; or discharged, without naming the mortgage, the mortgage will share the fate of the debt. The right in it passes by operation of law, rather than by the act of the party. Green v. Hart, 1 Johns. 580, adopts the same principle. The dictum of Lord Hardwicke, as it is expounded by the complainant, would be inconsistent with the doctrine maintained in these and other cases of similar import. But it appears to me that it can not be applied to a person who-has required an interest in the debt, and with that limitation, it has no unfavorable bearing on the claim of the defendant, nor does-it conflict with the cases just cited.
*364 It must be recollected, however, that the matter directly in contest between these parties, is the two quarter sections not conveyed by Newman in his life. The three quarters which wero conveyed, have been disposed of. As to these quarters the defendants certainly stand on higher ground. They have the legal title, against which the complainant is setting up an equity, and the question is, whether the court will deprive them of that title, and if they will, upon what terms. In deciding this question, it is necessary to consider on what ground the complainant stands. He had no concern in the contract, and as a party, he has no interest in it. He is pursuing the rights of Beam, in the character of a creditor, and any circumstances of hardship, in his own case, are not to be considered here. He stands in the shoes of Beam, and the case must be decided as though Beam were the complainant, praying for a specific execution of his contract. Yiewed in this light the complainant must do equity before he can expect to receive it.
Whatever might have been the understanding of the parties, we find the defendants with the law on their side, and with an equity at least as strong as that of the complainant. The purchaser is insolvent, and the defendants must lose the purchase money if they are compelled to give up the title, which is the only plank on which their hopes can rest. I do *not know on what principle Beam can extort it from them, before he has complied with his part of the contract. It certainly was not the intention, or expectation of those concerned, that he should have the land without paying for it. If the title had remained in the vendor by mere accident, I could not hesitate to say that equity ought not to take it from him till the contract is fulfilled. But in this case there is both positive and presumptive evidence that Newman relied on the title and retained it as his security.
The third inquiry is, did the payment of seven hundred and fifty dollars, the sum named in the title bond, entitle the purchaser to a deed for the two quarters, before the whole of the purchase money due on the contract was paid? The counsel for the complainant have treated the case as though there were two contracts, one relating to the three quarters conveyed, and the other to the two quarters not conveyed, and on that ground they ■claim a right to the two quarters, because they allege the .purchase money for them has been paid in full. But they have *365 certainly taken an incorrect view of the subject, for in the first place there is not anything that indicates two contracts, and in the second place, the most rational conclusion, as to the payment is, that they were not made with reference to one portion oí the land, more than another.
The defendants allege, positively, in their answers, that the five quarter sections were sold in a body, at the average price of five dollars and fifty cents per acre, amounting to four thousand four hundred dollars. Henry Bell, Michael Newman, and Michael Beam, Jr., testify to the same fact. They prove that the land was sold in a lump, at an average price, and by a single contract. The testimony of Pearce amounts to the same thing. He heard the parties speak of the transactions as one contract, and understood from them that the land was bound. In addition to this, the nature of the transaction and the circumstances attending it, show clearly that there were not two contracts. There was a great difference in the value of the quarters, both as to quality of soil and improvements. Some-of them were entirely unimproved, a part of them were improved to a considerable extent, and yet they were sold at an average price. This could not have been the case, if they had been purchased ^separately. The sum of twelve hundred dollars paid in hand was deducted from the amount of the five quarters, and notes with security were given for the residue, without distinguishing for what particular portions of the land they were given, and all the quarters were purchased at one and the same time. From these circumstances, independent of the testimony, the inference is irresistible, that the five quarters were purchased by one and the same contract. The execution of the title bond is no evidence of two contracts. It was the natural consequence of the difference in the situation of the title. As there was money due to the United States on three of the tracts, which was to be paid by the purchaser, it was necessary to assign him the certificates for those tracts, to enable him to ■ complete the payment, and as the vendor was to retain the title of the two, for which patents had been obtained, it was natural to give a title bond, and as it was the understanding of the parties that all the land was to be bound for the purchase money, and as obligations had been given for the whole amount, the sum named in the title bond was most probably accidental. There is no rule of calculation suggested by the case, from which it can be ascer- - *366 tained that seven hundred and fifty dollars was due on the two quarters. At the average price, they amounted to seventeen hundred and sixty'dollars. If the whole payment of twelve hundred dollars, be deducted from them, the sum due would be five hundred and sixty. If a proportionate part be deducted, the sum due would be twelve hundred and eighty dollars.
The admission so much relied on, that seven hundred and fifty • dollars had been paid, amounts to nothing, for it appears from the testimony of Mr. Parker, that at the time those declarations were made, the payments amounted to more than three times that sum, as the original debt had been reduced to eleven hundred aud sixty-seven dollars. But there is not the slightest reason to suppose that .any part of this money was paid with special reference to these quarters. Counsel have labored to give the case that aspect, but without success. The facts do not sustain it.
The fourth and last inquiry is, will the court give effect to the deed executed by the executors?
^Chancery may aid a deed, rendered inoperative by accident, or mistake, when the grantor had power to convey, and intended •to do so, but it can not generally supply a want of power. It can not give effect to deeds executed by persons who have neither title, nor authority to convey, from those who have the title. The deed from the executors of Newman to Beam was unauthorized and illegal. Its operation was not prevented by a defect in the form, or in the execution of it, but by a total want of power to convey, which no court of equity can supply. A decree may remedy a mistake in a conveyance by a person having power to convey, but it can not create a power. The former is often done, when the rights of third persons are not affected, or when equity would, in -the first instance, have decreed a conveyance. But in this case the executors attempted to convey without authority, and if their deed had taken effect, it would have been injurious to third persons. The statute has pointed out the only method by which executors or administrators can obtain power to sell real estate, orto execute jeontraets for the sale of it, made by their testators, or intestates, jit is necessary to pursue that course, in order to obtain the power, and an attempt to convey, before they have done so, must be wholly inoperative. The power must be obtained from the common pleas, and it would not be more irregular, for this court to .grant the power in the first instance, than to remedy a want of it *367 after a fruitless attempt had been made to execute it, and besides, when application is made to the common pleas, for an order to execute a contract, it is their duty to see that the contract has been fairly made, and fully complied with on the part of the purchaser, and if they should unadvisedly, order a conveyance, while any portion of the purchase money was due and unpaid, it would be contrary to the statute, and such a fraud on the heirs or devisees as would justify the interference of this court for their protection. There are two circumstances, then, which prevent us from giving effect to the deed made by the executors of Newman : .
1. They made it without having obtained a power for that purpose from the court of common pleas.
*2. As the contract had not been fully complied' with on the part of Beam, the common pleas were not authorized to grant the power, and if they had made an order for that purpose, it might have been avoided as a fraud, on those who were interested in the contract; so that the question resolves itself into this, will chancery give effect to a deed made without authority, and under such circumstances as would authorize them, if an authority had been granted, to lay their hands on it as a fraud on third persons ?
The complainant seems to rely much on the alleged equity of his case. But if he has an equity it can not aid him, because the defendants have an older and a stronger equity. It does not appear when the debt to Tiernan was contracted, nor is it material to know. His judgment was rendered in 1817. The lien of the defendants has existed since 1811. The equity of the complainant extends only to that portion of interest that would remain in Beam, after all prior equities are satisfied. On this principle he is to be postponed to the defendants who hold an older equity. The defendants have also the strongest equity. Newman was the proprietor of the whole property. He was not bound to sell it ; and after he had contracted to sell, he was not bound to convey, till the consideration money was paid. Beam had no right to appropriate it to his own use, or to the use of his creditors, further than he had made it his own by paying the purchase money. Were we now to appropriate the proceeds of this land to the satisfaction of the judgment, we should virtually decree the estate of Newman to pay the debts of Beam, without a previous liability, and without a consideration; but, on the other hand, if the complainant receives what the land is worth, more than the residue of *368 the purchase money due on the contract he ■will obtain all the right, of his debtor, beyond which he has no equitable claim. The complainant’s counsel, to strengthen himself on this point, urged very earnestly that Beam had treated the land as his own — that it was reputed to be his — that it gave him credit — and that the world was thereby deceived.
In a contest about personal property, as to which possession is prima facie evidence of right, such facts as these are entitled to weight and are sometimes decisive of the matter in controversy, *but the occupancy of land is not considered as an evidence of title. No prudent man would rely on such circumstances, but would rather resort to the records, where the truth may be ascertained, and if he omit this precaution the consequences are chargeable to himself. But the argument drawn from this source is . wholly gratuitous, because there is no evidence to show that Tier-nan knew of such facts, or relied on them, when he gave ci'edit to Beam. If the legal title had been conveyed to Beam, and the defendants were resting entirely on their equitable lien, there might be some plausibility in recurring to these circumstances; but the fact is not so, the legal title has not been conveyed, the defendants were not bound to vigilance, they had the same right to rely on their title, as a legal mortgagee has, and the same right to reply to-the complainant, caveat emptor. It is readily admitted that facts of this description sustain the exception to the general rule made-in favor of subsequent purchasers, for a valuable consideration, without notice, as to whom the equitable lien can not be enforced. It was also urged that Hedges considered the deed from the executors as valid, and supposed that he had no right to rely on the-land as a fund to pay the purchase money for which be was bound to-Newman. This maybe so, but his ignorance does not forfeit his rights.
On the -whole, we are satisfied that the sum due to the estate of Newman must first be paid out of the proceeds of the sale, and the residue paid over to the complainaht.†

Noin by the Editor. — This case, so far as relates to the transferable character of the vendor’s lien, is re-affirmed, v. 35. As to the same point, see also xiv. 20. Talcing personal or real security, as between vendor and vendee, does discharge the vendor’s lien, xiv. 428. But so far as this last case decides that talcing real security discharges the vendor’s lien, it is reversed by the decision in xvii. 500, where the opposite doctrine is held. It (xiv. 428) also overrules^ *369 as would seem, the law of the case to which this note is appended, so far as relates to the effect of taking personal security on the lien of the vendor. The ease in xvii. 500, has, in the argument of counsel, and the majority and dissenting opinions, an elaborate exposition of our own and other decisions on this point. It is there decided that taking mortgage by vendor does not defacto extinguish his equitable lien for purchase money. Other decisions relating to vendor’s liens, see vii. 21, part 1. As to correction of administrator’s conveyances in equity, see also iv. 469; xiii. 368.
As to specific performance, see Townsend v. Alexander, ii. 18, and note.